**Tristan STONGER, Appellant–Respondent,**

v.

**Beth Ann (Stonger) SORRELL, Appellee–Petitioner.**

**No. 52A02–0007–CV–443.**

Court of Appeals of Indiana.

June 11, 2001.

Rehearing Denied August 20, 2001.

Ronald E. Elberger, George T. Patton, Jr., Bose, McKinney & Evans LLP, Robert E. Saint, Emswiller, Williams, Noland & Clarke, Indianapolis, IN, Attorneys for Appellant.

Rosemary Higgins Burke, Burke, Lee and Heller, Rochester, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Respondent, Tristan V. Stonger (hereinafter referred to as "Stonger"), appeals the trial court's denial of his Petition to Set Aside the Court's Judgment.

We remand for further proceedings consistent with this opinion.[1]

### ISSUES

Stonger raises two issues on appeal, one of which we find dispositive and restate as follows: whether the trial court applied an incorrect and erroneous legal standard of "fraud upon the court" under Ind. Trial Rule 60(B).

### FACTS AND PROCEDURAL HISTORY

On August 29, 1991, Stonger and Appellee–Petitioner, Beth Ann (Stonger) Sorrell (hereinafter referred to as "Sorrell"), were divorced in Montana. Stonger and Sorrell shared joint legal and physical custody of their two minor sons, T.S., born December 7, 1984, and S.S., born November 25, 1986. While the divorce was pending, on August 20, 1990, a Montana court denied Stonger's motion to set aside an order allowing Sorrell to leave Montana with the minor children. Subsequently, Sorrell moved with the children to Miami County, Indiana. Stonger also moved to Miami County.

Following the divorce, Sorrell remarried and moved to Clinton County, Indiana. On October 7, 1993, the Miami Superior Court modified physical custody of the parties' minor children, granting physical custody to Stonger. The court found that although both parents were fit and proper parents, it was in the children's best interests to remain in the Maconaquah School District, in Miami County, and thus, in the primary custody of Stonger.

On April 24, 1995, Sorrell filed a Verified Petition for Modification of Custody and Petition for Custodial Evaluation with Dr. John C. Ehrmann, Ph.D. (Ehrmann). Ehrmann submitted a detailed written report into evidence. The report incorporated home studies, interviews by Ehrmann with the parties and the minor children, reports received from The Family Counseling Center, psychological testing performed by Ehrmann, a report from Helen Gray—a social worker who saw the children in 1994, school records, a report from T.S.'s teacher, a psychiatrist's report on examination of the children and her testimony from a previous custody hearing, and numerous letters. The report concluded that physical custody of the children should be transferred to Sorrell as soon as possible.

Consequently, on August 15, 1996, the Miami Superior Court entered its Findings of Fact and Conclusions of Law. The trial court found that it would be in the best interests of the children that sole custody be granted to Sorrell, effective immediately. Stonger appealed the trial court's judgment to this court and we affirmed the trial court's judgment in a memorandum opinion, *Stonger v. Sorrell*, 684 N.E.2d 268 (Ind.Ct.App.1997).

Subsequently, on June 18, 1999, Stonger filed his Petition to Set Aside the Court's

---

1. Oral argument was held in this case on April 25, 2001, in Indianapolis, Indiana.

Judgment of August 15, 1996. Under T.R. 60(B)(8), Stonger alleged fraud upon the court. Stonger argued that the statutory process for making child custody determinations was corrupted through the use of an unconscionable scheme to influence in an illegal manner the custody evaluator's decision and in turn the trial court's decision.

The following facts relate back to the time period prior to Sorrell filing her Petition for Modification of Custody and are the bases for Stonger's Petition to Set Aside the Court's Judgment of August 15, 1996.

Prior to filing her Petition for Modification of Custody, Sorrell was referred by her attorney to Dr. Jamia J. Jacobsen (Jacobsen) and The Family Counseling Center. On November 19, 1994, Sorrell took T.S. and S.S. to see Jacobsen at The Family Counseling Center without Stonger's permission. During the session, Jacobsen spent approximately fifty minutes with Sorrell and thirty minutes with each child. On December 3, 1994, Jacobsen spent approximately ninety minutes with the children and their stepfather. According to Jacobsen's records, T.S. and S.S. filled out "Criteria for Custody" worksheets and questionnaires. (Supplemental Record (S.R.) 131–134).

On April 5, 1995, Dr. David Gover (Gover), a licensed psychologist in Jacobsen's office, purportedly wrote separate psychological reports for T.S. and S.S. The reports concerning T.S. and S.S. portrayed their relationship with Stonger in a rather poor and negative light. Both of these reports were signed by "David Gover." (R. 405 & S.R. 179).

When Ehrmann was assigned to conduct the custodial evaluation, he invited Stonger and Sorrell to provide him with any collateral data that would assist him in the evaluation process. On September 6, 1995, Sorrell signed consent forms so that Ehrmann could obtain the records of Jacobsen and Gover. Ehrmann then used these reports as part of his custody evaluation.

At some point, Stonger discovered that in Jacobsen's curriculum vitae, she portrayed herself as a mental health expert, having minors in psychology in her undergraduate degree and master's degree from Indiana University; that she had completed courses in marriage and family therapy from Butler Christian Theological Seminary in 1988; and that she had some type of degree in marriage and family therapy known as an "AAMFT" from Indiana University and Purdue University at Fort Wayne. Through the testimony of the Senior Assistant Registrar from Indiana University, the Registrar at Butler University, the Registrar at Christian Theological Seminary, and the Registrar at Indiana University and Purdue University at Fort Wayne, it was found that none of these statements in Jacobsen's curriculum vitae were true.

Although certain statements in Jacobsen's curriculum vitae were false, it should be noted that through additional evidence presented, it was revealed that Jacobsen's academic credentials include: Indiana University degree, Bachelor of Science in Education, June 4, 1962—in the education department, Jacobsen's courses included: Adolescent Behavior and Development, Psychological Measurement in the School, and Social Psychology of Physical and Mental Disabilities; Indiana University degree from Indiana University Purdue University Indianapolis, Master of Science in Education, Special Education, August 31, 1975—at the Master's level, Jacobsen had one course in the psychology department, Classroom Behavior Management; participation in a credentialing process from the American Association for Mar-

riage and Family Therapy beginning in 1975, including both classroom instruction and extensive clinical supervision, becoming an approved supervisor in 1993; Indiana University, Doctor of Philosophy, 1983; Butler University, Fundamentals of Counseling Theory and Technique, fall semester 1989–1990; clinical member in good standing in the American Association for Marriage and Family Therapy, since 1990; Family Mediation Training, completed September 25–29, 1991; licensed Marriage & Family Therapist, State of Indiana, issued August 19, 1992; licensed Clinical Social Worker, State of Indiana, issued July 9, 1993; Newport University, Newport Beach, CA, Doctor of Psychology, December 20, 1996.

Additionally, Stonger also discovered that Gover's psychological reports of T.S. and S.S. were not prepared by him or signed by him. Jacobsen's former secretary, Pam Hamstra (Hamstra), testified that she signed Gover's signature to both reports without Gover's authorization. Hamstra further testified that Jacobsen instructed her approximately once a month to sign Gover's signature to reports. Gover did not authorize Jacobsen or Hamstra to sign his signature on T.S. or S.S.'s psychological reports or any other reports.

Finally, in a letter dated November 16, 1995, Sorrell's attorney wrote to her:

> Dr. Ehrmann has also indicated that he was willing to put in his report a statement regarding the negative impact of the delay on the children in order for us to stave off what we know is coming next, which will be a request from them for a second custody evaluation.

(S.R. 99). In his custody evaluation, Ehrmann wrote:

> The final recommendation offered is that this entire matter be resolved as quickly as possible. There are some emerging signs of depression in [T.S.]

which are certainly of concern. Other individuals as well as this evaluator have clearly expressed concern about the lack of resolution in this case and the need for the boys to adjust to a known future. Further delays would continue to maintain the boys in an ongoing and stressful situation.

(R. 644). In its August 15, 1996 Findings of Facts and Conclusions of Law, the trial court discussed Ehrmann's custody evaluation. The court stated that "[t]his report concluded that physical custody of the parties' minor children should be transferred to Mother as soon as possible." (S.R. 196).

With all of the above mentioned facts in mind, Stonger's Petition to Set Aside the Court's Judgment of August 15, 1996 alleged that: 1) Jacobsen falsely portrayed herself as having significant academic training; 2) the Gover psychological reports of T.S. and S.S. were fabricated; and 3) Ehrmann inappropriately communicated with Sorrell's counsel, and this inappropriate communication is reflected in Ehrmann's custody evaluation and in the trial court's August 15, 1996 Findings of Facts and Conclusions of Law.

Consequently, on January 25–28 and February 16, 2000, the trial court heard evidence on Stonger's Petition. At the conclusion of Stonger's evidence, Sorrell moved for a judgment on the evidence. The trial court took this matter under advisement. On March 8, 2000, the trial court entered an order denying Sorrell's motion for judgment on the evidence. In its memorandum, the trial court stated:

> Most troubling to the Court is the evidence concerning the report of Dr. Gover. To say that this report and its production to Ehrmann is irregular is a vast understatement. Clearly the report is not Gover's work product and is a fabrication from someone at Jacob-

son's [sic] office. Jacobson [sic] is a leading candidate in this regard (although the Court does not second guess the current determination of the Boone County Prosecutor's Office that they will not pursue criminal charges which would require proof beyond a reasonable doubt). The Court has high hopes that the Indiana State Police will keep an active file upon this event and that appropriate professional review of Jacobsen's credentials, both in the context of this case and in the representations in her Curriculum Vitae, be initiated. The Court must admit that it cannot comprehend the motives behind this evidence fabrication; the evidence is tangential to the true issues pertaining to custody, except as to a depression diagnosis, and is poorly constructed to even deal with that topic.

\* \* \*

From the evidence presented, the Court believes that Ehrmann may not have done a very good job (the Court hasn't heard the evidence that could buttress his performance); the Court does not believe that he performed in bad faith. It is probably important to state first that the Court believes his testimony that the Gover/Jacobsen evaluation and materials were not significant to his decision and carried little weight.

\* \* \*

In addition to these challenges, Ehrmann's testimony is challenged based upon his preliminary statements to [Sorrell's] attorney Gloria Grinnan–Mitchell. The Court was surprised to earn [sic] from Lawler [sic] that there is no professional bar for the evaluator from making preliminary communications with the sides in a custody dispute. Ehrmann did not initiate the communication. The worst that could be said is that he accepted a recommendation from

one side prior to issuance of his opinion. None of this is an indication that he acted in any way contrary to his honestly formed beliefs as to the children's best-interests. (The Court isn't quite certain what to make of Grinnan–Mitchell's inquiry and whether she should have been making it; certainly some contact between counsel and an evaluator is common, but the kind of exchange of substance that here occurred without any kind of record going to opposing counsel is troubling).

\* \* \*

The Court's analysis of the evidence presented is that the Gover/Jacobsen report is a fabrication, but it does not count for much. The balance of fraud allegations against Beth [Sorrell], Gloria Grinnan–Mitchell, and Dr. John Ehrmann are unproven.

(R. 207–210).

On March 13, 2000, Sorrell notified the trial court that she did not intend to present evidence. On March 15, 2000, the trial court entered an order denying Stonger's Petition to Set Aside the Court's Judgment of August 15, 1996. In its Order, the trial court referred to its March 8, 2000 memorandum as its reasoning for denying Stonger's Petition.

On April 14, 2000, Stonger filed a motion to correct errors and a supporting brief. The trial court heard oral argument on May 17, 2000. On June 7, 2000, the trial court denied Stonger's Motion to Correct Errors. Stonger now appeals.

## DISCUSSION

Stonger argues that the trial court erred in denying his Petition to Set Aside the Court's Judgment of August 15, 1996. Specifically, Stonger alleges fraud upon the court because: 1) Jacobsen falsely portrayed herself as having significant aca-

demic training; 2) the Gover psychological reports of T.S. and S.S. were fabricated; and 3) Ehrmann inappropriately communicated with Sorrell's counsel, and this inappropriate communication is reflected in Ehrmann's custody evaluation and in the trial court's August 15, 1996 Findings of Facts and Conclusions of Law.

Stonger's action was brought pursuant to T.R. 60(B)(8), which provides:

(B) Mistake—Excusable neglect—Newly discovered evidence—Fraud, etc. On motion and upon such terms as are just the court may relieve a party or his legal representative from an entry of default, final order, or final judgment, including a judgment by default, for the following reasons:

\* \* \*

(8) any reason justifying relief from the operation of the judgment, other than those reasons set forth in subparagraphs (1), (2), (3), and (4).[2]

\* \* \*

The motion shall be filed within a reasonable time for reasons (5), (6), (7), and (8), and not more than one year after the judgment, order or proceeding was entered or taken for reasons (1), (2), (3), and (4). A movant filing a motion for reasons (1), (2), (3), (4), and (8) must allege a meritorious claim or defense. A motion under this subdivision (B) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding or for fraud upon the court.

When a T.R. 60(B)(8) motion is filed, the burden is on the movant to demonstrate that relief is both necessary and just. *Gipson v. Gipson,* 644 N.E.2d 876, 877 (Ind.1994). The decision of whether to grant or deny the T.R. 60(B)(8) motion is left to the equitable discretion of the trial court, and is reviewable only for abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, together with any reasonable inferences arising therefrom. *Matter of Commitment of Pepper,* 700 N.E.2d 253, 256 (Ind. Ct.App.1998). Moreover, an abuse of discretion also occurs when the trial court has misinterpreted the law. *Id.* We will not reweigh the evidence in conducting this review. *Gipson,* 644 N.E.2d at 877.

Stonger maintains that the trial court applied an erroneous legal interpretation of "fraud upon the court" in at least six ways: (1) fraud upon the court does not require that officers of the court participate in the crimes; (2) the trial court did not recognize that Jacobsen engaging in an illegal scheme to influence the trial court's decision to transfer custody from Stonger to Sorrell is fraud upon the court; (3) Stonger is not legally required to prove that Sorrell intentionally engaged in the fraud to constitute fraud upon the court; (4) Stonger is not required to establish the extent to which the fraud and crimes impressed Ehrmann or the court in changing custody; (5) fraud upon the

**2.** T.R. 60(B)(1) (2) (3) & (4) state as follows: "(1) mistake, surprise, or excusable neglect; (2) any ground for a motion to correct error, including without limitation newly discovered evidence, which by due diligence could not have been discovered in time to move for a motion to correct errors under Rule 59; (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) entry of default or judgment by default was entered against such party who was served only by publication and who was without actual knowledge of the action and judgment, order or proceedings."

court is committed when a parent's attorney communicates with a custody evaluator without disclosing to the opposing counsel the substantive communications about a premature decision; and (6) the issue of fraud upon the court can be raised well after the entry of judgment transferring custody from Stonger to Sorrell.

In *In re Paternity of Tompkins*, 518 N.E.2d 500, 506–507 (Ind.Ct.App.1988), this court discussed the concept of fraud upon the court and held as follows:

> A second ground for an independent action to set aside a judgment can be based upon the doctrine of "fraud on the court". 7 Moore's Federal Practice ¶ 60.33. This type of fraud also is referred to in T.R. 60(B)'s savings clause. However, unlike an action for extrinsic fraud, an action for "fraud on the court" is not limited by laches and may be brought at anytime. 7 Moore's Federal Practice ¶ 60.33. Courts and commentators have struggled with the task of defining and applying the doctrine of "fraud on the court". [citation omitted]. The doctrine of fraud on the court was examined and applied in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.* (1944), 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, in which the court held that a party's collusion with an attorney and fabrication of a trade journal article to obtain a patent amounted to fraud on the Patent Office when the patent was issued and fraud on the court when the fabricated article was used to support an infringement suit. *Hazel–Atlas*, 322 U.S. at 245–46, 64 S.Ct. at 1001, 88 L.Ed. at 1255.

> \*    \*    \*

*Id.* The doctrine of "fraud on the court" as applied in *Hazel–Atlas* has been narrowly applied by the courts and appears to be limited to only the most egregious circumstances involving the courts. 7 Moore's Federal Practice ¶ 60.33. However, if a party establishes that an unconscionable plan or scheme was used to improperly influence the court's decision, and that such acts prevented the losing party from fully and fairly presenting his case or defense, then "fraud on the court" exists. [citation omitted].

To demonstrate that fraud upon the court was committed in the present case, we need only discuss and analyze two of the six arguments that Stonger has raised.

### A. Illegal Scheme to Influence the Trial Court's Decision to Transfer Custody

◼ Stonger argues that Jacobsen engaged in an illegal scheme through forgery and fraud to influence the trial court's decision to transfer custody from him to Sorrell. It is undisputed that Jacobsen held herself out as an individual with certain academic training that she did not actually have. It is also undisputed that Gover testified that the psychological reports of T.S. and S.S. were not prepared by him or signed by him. Thus, Stonger contends that Ehrmann improperly adopted and incorporated materials from Jacobsen and Gover into his custody evaluation, which ultimately influenced the trial court's decision to transfer custody.

On the other hand, Sorrell argues that although Jacobsen's curriculum vitae had some inaccuracies and Gover's report was apparently fabricated and forged, it was Ehrmann's report that the trial court ultimately relied on to help guide its decision on transferring custody. Ehrmann submitted a nineteen page custody evaluation in which he used data from numerous sources. While it is true that Ehrmann used information from Jacobsen and Gover, when asked, "[d]o you have an opinion as to how much weight that collateral source data from the Family Counseling

Center carried in your overall recommendation," Ehrmann testified,

> The, uh, I guess that I do. I, I—what I can tell you is that I didn't find it particularly significant, but it was certainly somewhat helpful. My concerns, and I discussed this already, were the seeming appearance of a confused role, meaning was it counseling, was it custodial in nature, and my discomfort with that because there was certainly no complete custody evaluation done. Uh, I considered it, I looked at the information, reflected some of it in the report, but it wasn't by any means close to the strongest or one of the strongest factors in me arriving at my conclusions and recommendations.

(R. 1085). Moreover, when asked "[i]s it safe to say had you not received any information from the Family Counseling Center, your recommendation would remain the same," Ehrmann testified, "[a]bsolutely, without question." (R. 1085). Consequently, Sorrell maintains that even though Jacobsen misrepresented herself on her curriculum vitae and Gover's psychological reports were not prepared by him or signed by him, neither Ehrmann nor the trial court were improperly influenced by Jacobsen or the Gover reports, and, thus, Stonger was not prevented from fully and fairly presenting his case.

12 MOORE'S FEDERAL PRACTICE, ¶ 60.21[4][a], at 60–52 (3d ed. 2000), provides:

> "Fraud on the court" is defined in terms of its effect on the judicial process, not in terms of the content of a particular misrepresentation or concealment. *Fraud on the court* must involve more than injury to a single litigant; it is limited to fraud that "seriously" affects the integrity of the normal process of adjudication. Fraud on the court is limited to fraud that does, or at least attempts to, "defile the court itself" or that is perpetrated by officers of the court "so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases."

*Id.* (footnote references omitted) (emphasis in original).

Additionally, in *Hazel–Atlas Glass Co.,* 322 U.S. at 246, 64 S.Ct. 997, the Supreme Court of the United States held that tampering with the administration of justice involves far more than an injury to a single litigant. "It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id.*

Sorrell has attempted to convince this court that because Ehrmann's recommendation would have remained the same with or without the information from Jacobsen and Gover, a fraud upon the court has not been perpetrated. We disagree. Though Ehrmann testified that his recommendation would remain the same without the Jacobsen and Gover reports, we cannot be entirely sure that the trial court's decision to transfer custody would remain the same. When looking at the Miami Superior Court's Findings of Fact and Conclusions of Law from August 15, 1996, it is clear that trial court was influenced by Ehrmann when deciding to transfer custody of T.S. and S.S. from Stonger to Sorrell. The trial court refers to Ehrmann's testimony and custody evaluation numerous times.

As previously stated, it is undisputed that Jacobsen held herself out as an individual with certain academic training that she did not actually have. It is also undisputed that Gover testified that the psychological reports of T.S. and S.S. were not prepared by him or signed by him. The forged and fabricated materials from these people were then used in Ehrmann's custo-

dy evaluation. Ehrmann's custody evaluation was then used by the trial court. We find that a cloud of doubt has been cast and the entire evaluation process was tainted. When dealing with the lives of children and family, we must be especially careful. This court cannot overlook such blatant fraud simply because the custody evaluator maintained that his recommendation would have remained the same without the forged and fabricated materials. It would be an injustice not only to the parties involved, but to the entire legal and judicial process.

### B. *Intent and Fraud Upon the Court*

Stonger further argues that he is not legally required to prove that Sorrell intentionally engaged in the fraud to constitute fraud upon the court. The Indiana case law on intent and fraud upon the court is not clear. However, Stonger cites to *Mallonee v. Grow*, 502 P.2d 432, 438–439 (Alaska 1972), in which the Supreme Court of Alaska held:

> There has been no showing of an actual intent to defraud on the part of Mallonee or his attorney and we do not wish to case [sic] such aspersions upon them. Nevertheless, fraud may be found in the absence of an intent to defraud; indeed, fraud may be found even where representations are made with a good faith belief in their truth. Whether the deprivation of a party's rights by actions of the court are attributable to a willful intent to defraud or a reckless disregard of rules or statutory provisions, the court has the same duty to rectify the wrong. The mechanism for protecting an [sic] maintaining the decisional integrity of our judicial system is found in the statutes and rules which govern the procedures to be followed by parties, attorneys and judges. The purposeful or reckless disregard of those procedural safeguards which results in the deprivation of substantive rights constitutes an impermissible corruption of the court process.

Thus, it is Stonger's argument that the test is not intentional conduct, rather it is reckless conduct. Furthermore, Stonger asserts that the law does not require that Sorrell be a knowing participant in the fraud. Stonger maintains that fraud may be imputed to Sorrell through Jacobsen acting as her agent.

On the other hand, in *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1267 (10th Cir.1995), *cert. denied*, the Tenth Circuit held:

> We think it clear that "fraud on the court," whatever else it embodies, requires a showing that one has acted with an intent to deceive or defraud the court. A proper balance between the interests underlying finality on the one hand and allowing relief due to inequitable conduct on the other makes it essential that there be a showing of conscious wrongdoing—what can properly be characterized as a deliberate scheme to defraud—before relief from a final judgment is appropriate under the *Hazel–Atlas* standard. Thus, when there is no intent to deceive, the fact that misrepresentations were made to a court is not of itself a sufficient basis for setting aside a judgment under the guise of "fraud on the court."

*Id.* (citation omitted).

■ Clearly, there are differing viewpoints on intent and fraud upon the court. It is our determination that intent is not absolutely necessary to establish fraud upon the court. As the Supreme Court of Alaska found in *Mallonee*, 502 P.2d at 438, we also find that whether the deprivation of a party's rights by actions of the court are attributable to a willful intent to defraud or a reckless disregard of rules or statutory provisions, the court has the

same duty to rectify the wrong, regardless of intent.

We agree with Stonger that fraud upon the court may be imputed to a party through its agent. Additionally, we should note that this process of fraud began when Sorrell took T.S. and S.S. to Jacobsen's office upon her attorney's referral and without the knowledge of Stonger. If a party, attorney or other person, acting in furtherance of a party, attempts to or defiles the custody evaluation process through the use of forged or fabricated psychological reports and the use of purported counseling records from a person with fraudulent academic records and credentials, the determination of custody has been corrupted. Once the statutory and judicial process is effectively corrupted, the court has a duty to rectify the wrong, regardless of who perpetrated the wrong.

Accordingly, we find that Stonger has established that an unconscionable plan or scheme was used to improperly influence the trial court's decision, and that such acts prevented Stonger from fully and fairly presenting his case. *See In re Paternity of Tompkins,* 518 N.E.2d at 507.

### CONCLUSION

Based on the foregoing, we conclude that the trial court erred in denying Stonger's Petition to Set Aside the Court's Judgment. Therefore, we remand this matter for rehearing. However, custody of the two minor children will remain with Sorrell until the trial court's decision on rehearing is issued.

Remanded for further proceedings consistent with this opinion.

ROBB and DARDEN, JJ., concur.